Thank you for waiting. Swinomish Indian Tribal Cmty v. BNSF Railway Company Thank you for waiting. Swinomish Indian Tribal Cmty v. BNSF Railway Company Good afternoon, Your Honors. May it please the Court, I'm Ben Horwich on behalf of the Appellant and Defendant BNSF Railway Company. This is a case about existing common carrier rail service and whether it can be restricted through the remedy of a court injunction. In a century of exclusive federal regulation of railroads, there is no appellate precedent for such an order, and in fact it has been repeatedly rejected. And so that specific principle is what controls the issue before the Court on this interlocutory appeal. I want to be clear for the Court, though, that that principle is circumscribed in at least three very significant ways. The first is there has to be common carrier service. This is a set of rules about interstate commerce by common carriers under the jurisdiction formerly of the Interstate Commerce Commission, now the Surface Transportation Board. And so this doesn't apply to private lines. So, for example, what we saw in the settlement of the prior Southern Pacific litigation that we described in our reply brief and that came to this Court on two trips in the 70s and 80s, they took that line out of common carrier service, converted it to a private line, and it has a different status. Counsel, is your position that the same principle which made the settlement agreement unenforceable here by the tribe, that that would also mean that you couldn't settle this case along the same lines, that basically that would be unenforceable as well? So I want to answer the question, although I do want to note that we don't agree with the premise that this settlement is actually unenforceable. What we're saying is that, first of all, the best reading of the settlement is that we can respond to shipper needs, that in fact shipper needs is referred to twice in that paragraph of the settlement. And we're not suggesting that it's not enforceable in court through the remedy of rent. And then, of course, if the tribe wants to pursue the remedies provided before the administrative agency to move the line out of common carrier status and control it contractually, they could. But to answer your question. They want to limit you to what you promised you would do without their permission. And you're saying that that is preempted by the Interstate Commerce Commission Termination Act. And my question is, if you came to the exact settlement here in this case, we'll settle this case, except you give us two trains a day of 25 cars or less, would that similarly be unenforceable in court? If we were to agree to that sort of very hard cap, and so I'll set aside our disagreement about how to read the settlement terms here. No, we cannot enter into an enforceable settlement that trades away the rights of shippers and the public. When we speak about shippers, we're speaking about everyone in this courtroom who uses gasoline made at the refineries. I mean, the public interest in the continued flow of commerce is such that the railroad and someone who controls land that the railroad passes over, those two parties are in no position to trade away the rights of the public to service. That's the choice that Congress made in 1920 when it federalized this entire area exclusively. If we agreed with you, could the tribe go back and try to get the original settlement agreement set aside on the grounds of mutual or unilateral mistake? Since you made a promise that you're saying they can't enforce through equitable action, could they get that whole thing set aside and then just go back and reinstate the 70s litigation to evict you as a trespasser? So I think that would be procedurally... Let me actually answer that in three parts. First, I think it would be procedurally complicated because, of course, the easement is entered into under the Indian Right-of-Way Act, and that requires the approval of the Secretary of the Interior. And so just as the Secretary has to approve the establishments of the rights of way, the Secretary would have to approve their disestablishment. So somehow the Secretary would have to be involved. I don't think this can be a claim for rescission in court. The second thing is that the Supreme Court told us in Tex-Mex and in Smith v. Hoboken Railway that in the situation where you have a dispute about the nature of the underlying land contract and there's a common carrier operating on it, the first step has to be to go to the Interstate Commerce Commission, that you shouldn't... Tex-Mex had nothing to do with land. So Tex-Mex... Tex-Mex dealt with, what, a trackage contract? Right. So that's an agreement to use a facility... That's an agreement between two different railroads about who can operate on the tracks, right? So it was tracks and facilities. So there was the ability to use the facilities of the other rail carrier. So in that respect, yes, it doesn't refer to... Excuse the word land. Does the word land appear in the Tex-Mex? I'm not sure if it does. I agree with Your Honor that it is about trackage rights. So it's about the use of the tracks. But, for example, then you would look at the City of Des Moines case from the Eighth Circuit, where that unquestionably was about the land, where the city wanted to oust the railway from using the land down Main Street or whatever street it was in the city. And so in that case explained that there's not a distinction between... There's not a distinction to be drawn about the particular underlying right when the question ultimately is, are you going to be affecting the common carrier service? But I'd like to return to my third answer, if I can remember it, to Judge Bennett's question about unwinding the settlement here. We would be... If we were to unwind this easement agreement, if there were no easement agreement, if we were to rewind 30 or 40 years to the prior litigation, we would be making fundamentally the same arguments about the exclusive jurisdiction of the federal regulator. In fact, that's exactly what the ICC did. The ICC in 1980, in the prior litigation, moved to intervene and dismiss that litigation because it was aimed at regulating rail transportation, which is something the ICC said in that motion intervene is exclusively within our jurisdiction. And so you go to the regulator first. But of course, the easy unquestioned principle is that the federal government has the right to regulate rail transportation and to preempt anything under state and local law that doesn't apply in the same way when the issue is a conflict with other federal law or with Indian treaty law. Do you agree with that? So I agree that the analysis is different, but the relevant question here is whether the tribe is in the correct forum and seeking the correct remedy. And so if you stack that question... And so why is it not in the correct forum? It has a settlement agreement that produced an easement pursuant to a suit that was brought to enforce a treaty obligation by the United States. And you say that's not enforceable in court? So the rule in the ICC Termination Act is that when you're seeking to regulate rail transportation, the exclusive remedies are in the jurisdiction of the Surface Transportation Board. Well, you know, I just decided a case in California with respect to uneven rates on the railroads prevailed that came straight to us. I guess I didn't have jurisdiction on your theory. No, that's not correct. And I'm quite familiar with that case. I was counsel for the railroad in that case. And I think actually, Judge Fletcher, your analysis in the California Department of Tax and Fee Administration case is exactly on point to how you should analyze the question here. The first step in the analysis in that case where, of course, we were challenging a state law as preempted. And so it's a different posture because procedurally we can, right, you wouldn't go to the Surface Transportation Board. It may or may not have been preempted depending on another federal law they had to carve out. Correct. And let me, and if I might, I'd like to explain why this case, following that analysis of harmonization, comes out differently. So in that case, Your Honor and Judge Ikuda in the concurrence or dissent agreed that ICTA would apply if it were the only statute at issue. So that was step one. And I think there's no dispute that ICTA would apply in the picture. The second question in that case was, well, there's another statute which authorizes fees. Now, I know Your Honor and the dissent disagreed on how to construe that statute. But the significant factor to Your Honor, and I think you specifically criticized the dissent for reading that other, the dissent would be reading that other statute that specifically authorized fees into oblivion, I think were your words, if you were not to give effect to that other very specific statute that you read to authorize this category of fees, although, as you point out, the particular fee didn't meet the criteria. If you apply that analysis here, that second step, you'd ask, well, what is that other statute that very specifically provides for a remedy in federal court? The treaty does it. I'm not sure I want to limit it to statute. What is that other federal obligation? Sure. There's a treaty? Yes. I'm sorry. I shouldn't say. There's a treaty? Yes. So there is a statute with regard to the Indian Right-of-Way Act, and then there's a settlement entered into pursuant to the suit, to settle the suit that was brought to enforce the treaty. That strikes me as federal law, and it strikes me as it is not something that can be preempted. It is not federal, not state law. It is not local law. Right. And so if I could finish the analysis, you would look at those statutes, and you would ask, the question before the court is, is an injunction from this forum available? And the treaty says nothing about remedies. It says nothing about forums. IRWA says nothing about remedies or forums. And in fact, the Secretary of the Interior has been completely agnostic on remedies and forums by saying, you just pursue whatever remedies are applicable. Right? And so in the face of that, unlike in the California case, where you would have left the hazardous materials law into oblivion, there's nothing about IRWA or the treaty that winds up in oblivion because the tribe Except the treaty. No, no. With respect, Your Honor, I think it's very important to recognize the tribe can go, the Congress has said you go to the STB. It has provided a remedy before the STB, which is an abandonment proceeding. And the tribe can assert its sovereign status. It can assert treaty rights it has. It can assert IRWA. It can raise those in the administrative forum subject to judicial review. Counsel, I want to go back to something you said a few minutes ago, that if we unwound this agreement, there still would be no remedy in federal court. So is it your position that if, for example, a railroad, as the tribe alleges, simply builds a rail line without any permission at all, totally as a trespasser across tribal land, that the tribe can't go into federal court to get rid of them? That the tribe, that the railroad does it totally without permission, is it your view that the only remedy the tribe has that is equitable is before the Surface Transportation Board, notwithstanding the fact that building the road was illegal in the first place? So no, that can't happen today. And that's because of the Transportation Act of 1920, which said if you're going to operate a common carrier railroad, you have to get permission from the ICC, or now under ICTA, it's the STB, you have to get permission to operate. And one of the things that the agency will look at is, do you have the underlying authority? So today, someone who wants to start a railroad can't build it in the dark of night and start operating. I mean, your hypothetical would have to posit incredible lack of attention from the regulators and the regulated entities, just complete lawlessness. Isn't that what happened? Well, no, because I think what happened here, I think two points. One, the reason this line is different is because it's prior to the, it was built and in operation prior to the Transportation Act of 1920. Without the permission of the tribe. Well, that issue was Correct? I'm not ready to concede that, because that was the subject of the Well, if you're not ready to concede that, where would you point to so we could see that the tribe gave permission? So the, one of the, let me give you an example of one of the questions in the prior litigation, if I could, is one of the contested issues in the prior litigation is whether the line was moved. It was originally engineered in one location, and was it reengineered to be And that, that issue did not get litigated to conclusion in the prior case. Right, because to avoid that, you promised that without the tribe's permission, there would only be one Eastern and one Western train of 25 cars or less each day. So the railroad avoided having that issue determined. So that, that settlement was, that estimate in terms of the actual business was a, was, that served for a generation. That was correct for a generation. And we put in the provision Until you started running longer cars more frequently. That's correct. But the nature of the, well, but with respect, Your Honor But, but, but counsel, it wasn't an estimate. It says Burlington Northern agrees. And there was a procedure where you could try to get it increased, but it wasn't Burlington Northern estimates. It was Burlington Northern agrees. So, Your Honor, if I could, I could point you to two things. First of all, I agree with you there's a procedure in there to negotiate with the tribe over increases. And we didn't follow that. And we screwed up there. That, that I don't think can, our, our, our mistakes in the earlier part of this decade in approaching the tribe can't You know, they weren't even mistakes. The tribe repeatedly wrote to BNSF. BNSF doesn't even respond. That's not a mistake. That's a deliberate failure to abide by the, the, the easement. With respect, Your Honor, I, I'm, I'm not, I'm, I'm not going to try to excuse our handling of it. But it's not a mistake. It was, well, there were so many letters sent by the tribe to BNSF objecting. The letters were not responded to. One letter you can miss. That's a mistake. There, I believe there's, there's a, there are a series of two or three. We did, we did then engage with the tribe. And with respect, Your Honor, it cannot be that our mistakes of that nature are going to You're calling them mistakes. May I also, I would also, if I see my time is up, but I think there's one piece of record evidence that bears very heavily on Judge Bennett's question, which is at ER 921, which is the correspondence that, that was exchanged when we were negotiating that, that prior settlement. And what BNSF told the tribe said, we can't agree to a hard cap. It says, and I'm reading from, from 921 here, the middle of the first paragraph, as a common carrier railroad, Burlington Northern is obliged to handle such cars properly classified, packaged and loaded to all destinations. And I'm down to the next paragraph. We cannot agree to a single train limitation or to limitation on the number of cars. At times, depending on business at the refineries, we must have may exceed 25 or 30. So the parties set up But the agreement says you agree, unless otherwise agreed in writing, you said that it can be increased if required by shipper needs, and they agree not to arbitrarily withhold permission, which meant that if you don't get their agreement, you have to follow a procedure to increase. There's nothing in this agreement that says you can just unilaterally go do it. So I, I, I, so I, that reading may be correct, although I don't think it resolves the prospective question, because as the, as things stand now, the tribe's position is that under no circumstances will it permit that increase. And that's the definition of an arbitrary refusal. That's the next question, whether the permission would be unreasonably withheld. That's the next question. That's not now in front of us. I, I'm not sure that that's correct, Your Honor. I, the, the, the summary judgment motion below, that, that issue was in fact the first issue addressed in the summary judgment motions, was whether this would be an arbitrary refusal to increase. And, and, and in our view, something that says we've recognized shipper needs, we're a common carrier railroad, we don't have a choice but to fulfill this obligation for the tribe to then say, well, there is no, there are no conditions in the world that would allow us to, under which we would permit you to do that. I don't see that question as in front of us. With respect, Your Honor, I would point, I would, I would point in the summary judgment motions, which led to the orders that are the subject of the appeal, I would, I would point, Your Honor, to the, the short appellee's excerpts of record, which has the, happens to have the table of contents of our summary judgment motion. It says BNSF's use, our argument, heading one, BNSF's use is consistent with the easement and the tribe's withholding of its consent is arbitrary because it would violate federal law. Isn't, isn't the issue that was certified, quote, the issue of preemption in the circumstances presented here? So of course, this court has under Yamhagen's Calhoun jurisdiction over everything in the orders. So the, the, the issue that's certified is the issue, the controlling question of law that makes it worth the court's while to take up the case. But of course, the, the, what are, what are actually certified are the orders themselves and of course, then the arguments the parties made that resulted in those orders. So that issue is, is before the court right now. And I, I also don't think it, I also don't think it makes sense for the court to try to separate the preemption issue from the proper interpretation of the easement because BNSF, in that letter that I just read, Burlington Northern at the time, was, was explaining, well, we have to come up with something that will allow us to fulfill our obligations to shippers. And so what the party settled on, and that of course is the same federal obligation that would make a contrary agreement unenforceable. And so what the party settled on was a provision under which, which is extraordinary, I would say, a provision under which is sort of a re-opener. You know, you're almost four minutes over. I am. Why don't we interrupt and we'll give you a chance to respond. Thank you, Your Honor. May it please the court. Chris Breen representing the Swinomish Indian Tribal Community and at council table with me is Stephen Leclerc, the tribe's legal director. Before I get into detail, I want to make three quick basic points. Number one, if you take a step back and look at it, what BNSF is actually asking the court to do is condone a de facto condemnation of the tribe's land. But tribal trust land can't be condemned. Tribal trust land can only be used with the tribe's consent and as this court in the Supreme Court had held, under conditions which the tribe imposes for the right to use that land. The truth is that the railroad took the land in 1889. It used that land for over 80 years and it entered into a voluntary agreement. It asked the Department of Interior to issue a right of way and today it is trying to take that land again because it believes it has a trump card in the ICCTA. Number two, the trial court has not made a decision on whether there was a material breach of the easement agreement or whether or not the tribe's refusal to grant permission was arbitrary. The request in the summary judgment pleading that council has addressed was that it was illegal just because we are causing them to violate a federal law that that would be arbitrary. But the actual decision of the tribe has never been decided at the lower level. What the tribe is asking this court is to affirm the trial court's ruling that injunctive relief is available for the ongoing breach and that the tribe's rights were not implicitly repealed or abrogated by ICCTA. We are not asking to stop railroad traffic consistent with the terms of the easement and we are not asking to control the commodities shipped. Number three, it is our position that the two statutory schemes can be harmonized and you can give effect to both. You can do so by honoring the scope of the tribe's consent, in other words, the 25 cars, one train each way per day, and you can allow the STB to have those 25 cars between the two shippers. I want to respond to a couple of issues raised by council. First of all, he said that the issue in the case was whether the line had been moved. That was an allegation made by a pipeline in one of the consolidated cases. We produced to BNSF all the underlying documents, they had none, from the history of this case. There is not one centella of evidence that the line was moved and in fact you have read the early letters in 1889, 1890, 91, they don't reference any movement of the tribe or the line across the tribe's land. They specifically say the rail line is being constructed on the reservation. I want to address the 1920 act. Council implies that the 1920 act authorized what is otherwise an illegal use of the rail line across the tribe's tracks. This assumes to be grandfathered that the occupation was legal. It was not. The railroad did not obtain a legal right to cross the reservation until 1991 and that legal right was confined by the conditions in the easement. Council, if we agreed with you that neither the treaty nor the Indian right of way act was abrogated, is one way that those statutes can be harmonized with the interstate commerce commission transition act is if you get to the point where the question of injunctive relief is before the court that the court can look at the normal injunction injunction factors including the public interest in and the public interest that the tribe has and the public interest in the free flow of interstate commerce by rail in deciding whether a particular remedy is appropriate or not? Your honor, I would agree with you that the trial court would have to make a determination whether injunctive relief was an appropriate remedy. All we're asking this court to is the availability of the remedy and we haven't gotten to the remedy stage because we haven't determined whether there was a material breach or whether the tribe acted arbitrarily. Those are issues that the trial court has to decide. Now as to whether or not it's the four-part federal standard for injunctive relief, my understanding is the ninth circuit has not imposed that four-part standard and it looks to what the law in the state is. But yes, there's an analysis that the trial court would have to use as to whether injunctive relief were the appropriate remedy. Okay, let me go back to the 1920 act because we know that in this court's decision in Southern Pacific versus Watt, the court held that unless you have a properly issued easement, a right-of-way easement, you are a trespasser. How can a trespasser acquire rights into use of tribal land? It can't. The town of Conway versus my coastline states that the act, that 1920 act, did not legitimize otherwise illegal presence. We have a trespass, it's an illegal presence, town of Conway says it doesn't do that. Contrary to BNSF's misstatement, Conway has not been overruled. It relies on text mixed, allied and correcting versus STB in the city of Des Moines. But as to those three cases, the use of the track at the time was legal. Okay, there was no allegation of trespass. And of course, we have the overriding issues here. We have a treaty which protects Indian rights to exclude non-Indians. We have the RWA, which is a complete set of schemes of itself, which authorizes access across tribal land. And we have the actual issued easement itself. None of those appeared in those cases that council relies upon. And certainly they didn't acquire a legal right just because the 1920 act was passed. I would also point out that the term common carrier does not appear in any of the settlement negotiation documents, not the correspondence between council, not in the settlement agreement, not in the application that the railroad made to the DOI, and not in the easement itself. The only references to shipper needs, those are not synonymous terms. You can have shippers that have needs that are under a private contract or other situations, but they are not necessarily common carrier. They're not synonymous. And I think the fact that that is missing is very important. It would be our position that until 1991, it was not legal and that per the town of Conway, the railroad was not a common carrier subject to ICC in 1920 or thereafter. And because of the limitations in the easement, it is not subject to the ICCTA today, as the railroad did not need to go to the ICC in 1991 for common carrier service because the line was outside the scope of the jurisdiction at the time. Although as council points out, the ICC tried to intervene to take a different, advancing a different view of that, correct? True. They did try to intervene, but that motion was denied. But I mean, the ICC's position was that what the tribe was seeking was, if I'm using the right term, an abandonment of the line. That was what they said in their motion, correct? I think that's correct, Your Honor. And there's no question that the issues that were before that decade-long litigation were involved. The primary defense, however, of the railroad and the other defendants in that case was that the tribe didn't own the land. Okay. That it wasn't part of the reservation. The ICC came in, I think it was in 1984 when it made its motion to intervene. That motion was denied. Where we are today, and I could go into it fairly extensively, but we have a situation where the railroad here is stating that it agrees that in the initial grant, the consent could be denied. In other words, if I'm a railroad and I go to the tribe and I say, I want a line across your reservation, the tribe could say no and the railroad could do nothing about it. What we have is a situation, however, where if that consent is given and it has conditions, the railroad has a trump card. I don't have to comply with those conditions. Their harmonization is not a harmonization. It is, in truth, an abrogation of the treaty right, and it's an implied repeal of the IRWA. And of course, it's an evisceration of the easement. And remember, this was an easement that was issued after 10 years of litigation, of hard-fought litigation. And I'd like to paraphrase Justice Gorsuch in the recent Cougar Den case. I'm not sure if you're aware of that case, but this is an old familiar story, as he states. The railroad obtained the right to use tribal land and in return made a handful of modest promises. Now the railroad is dissatisfied with one of those promises and wants more. But just as in Cougar Den, the road must be held to the terms of its deal, and this court and the BNSF made application to the STB for it to assume jurisdiction, and it declined. It said that the court was entitled to make the decisions in this case. There's another point I'd like to make, and that is that BNSF also asserts that if we are correct, that the Secretary of Interior would be, and I quote from their reply brief, a regulatory despot, the likes of which the U.S. Code has never seen, because it would be determining what conditions to impose on the applicant, and therefore there would be a conflict between the DOI and that of the STB. That's simply incorrect. Let's talk about what really happens when you have an easement grant. The conditions for the easement are negotiated between the conditions, just like they did in 1989. Those conditions are incorporated into the application by the railroad. It's the railroad who makes that application, not the tribe. The tribe must then consent, and that consent allows the IRWA and the DOI to issue pursuant to those conditions. The DOI has no authority to impose conditions on the tribe to which the tribe has not consented, and correspondingly the DOI has no authority to remove conditions to which the tribe has consented. The IRWA requires that the DOI, simply acting as the trustee for the tribe, be the issuing entity. It is authorized to include only those conditions that are mutually agreed to by the railroad and the tribe. The bottom line is that there are no conditions imposed that are not agreed to by the railroad and the tribe, and therefore there is no conflict between the authority of the DOI and the STB. The DOI is not a super regulator, as alleged by BNSF. I'd like to also spend a moment, they spend some time talking about the city of Baltimore. They quote it several times in their brief. The problem with the city of Baltimore and, or excuse me, the Baltimore and with Tex-Mex is that those cases can be easily distinguished and are not relevant to the case we have here. In particular, and you are correct, your honor, that there is no land issue in Tex-Mex. That was a trackage agreement between two railroads. One railroad owned the land and it owned the rail line, and it authorized another rail line to use it. In Baltimore, that was basically a straight-up trade. That's a situation where there were no restrictions in the original grant of the right to use my line and my land. And decades later, when the stockyard that granted that right learned that the railroad was shipping to competitors, it basically said, you have to either stop shipping to them or you pay me a fee equal to what I would earn if you'd ship to me. Those cases can be distinguished, and I think here's the points that really hit them. First of all, those are private contracts which had nothing to do with Indian law. Number two, there was no treaty which reserved to the tribe the right to exclude non-Indians. Number three, there was no rights of way are granted across Indian land. There was no voluntarily agreed to DOI agreed to right-of-way issue. There was no implied repeal, abrogation, or harmonized issues because of those issues in that case. The losing party, and I want to point this out also, acted inequitably or illegally. Here, the tribe has always acted equitably and legally. In conclusion, BNSF claims that it is required to comply with the conditions of the easement. Otherwise, it will be forced to violate federal law. But right now, BNSF is violating federal law. It's violating the IRWA by its intentional refusal to comply with its terms. In truth, at its basic argument, the railroad claims it does not make any difference how it obtains the tribe's consent. It can say or do anything to induce a tribe to consent to conditions in an easement grant to obtain the tribe's consent. But once obtained, if in the future those conditions become inconvenient and it wants more, it can simply ignore those conditions and hide behind its overly aggressive belief that the ICCTA preempts all rights in remedies. There is no case which supports its position, and it is unimaginable that Congress would have intended to abrogate the treaty rights, repeal the IRWA, and eviscerate the easement to allow this result, or that Congress would have done all this without saying a word. The railroad's history and actions are devoid of any equity. The railroad made a contract with the tribe based on the IRWA. A deal is a deal. It should be held to those terms of its voluntary commitments, and the district court's orders should be affirmed. In this case, should be allowed to go forward with the merits and the remedies available. Okay, thank you. Would you please put two minutes on the clock? Thank you for the court's patience and indulgence. My friend has made a number of suggestions about what the Secretary of the Interior thinks about things, what the Surface Transportation Board does or doesn't think about things. We have things in the record about what the ICC has said. I would point out that the reason the ICC's prior motion was denied was the district court said, well, we're not up to the remedies phase yet, so we don't need to know whether this is a problem. So I don't think that actually speaks very much. And suggestions about, well, we could have a system where the Secretary has decided things, and then within that sort of sandbox, the STB would regulate. It seems like a circumstance where the court could benefit from actually hearing from the about this settlement, about the question of the STB's jurisdiction in a case like this, how it interacts with the Secretary of the Interior when you have two agencies at issue. I mean, to your point, Judge Fletcher, it's a complicated question when there's different statutory schemes, and they're both administered by administrative agencies. And on top of that, the United States— The last word we heard from the United States was that the Secretary approved the easement, right? So I think that's correct, that the Secretary approved the easement, although what the Secretary understood it to do as far as prohibiting BNSF from future fulfillment of common carrier obligations is not clear. And similarly, the Surface Transportation Board, I think, has stayed to the side for the moment because courts are obviously capable of resolving these issues, and it would be this court's decision in the final instance. But there's a real lot of history here where, for example, in the Southern Pacific settlement, there was an understanding about how you structure these settlements, and they involved the ICC in order to settle that case. Speaking of settlements, if this case were settled between the railway and the tribe, and they signed a written settlement agreement, would that be enforceable? Well, I think it would depend on the terms. I mean, we try to— I'm talking where you sit down and mediate. Yes. Oh, yes. And the railroad says, here's what we need, and the tribe says, we'll agree to this, and you agree to an agreement, and it's signed in writing. Would that be enforceable? Absolutely, absolutely. In federal court? In federal court, absolutely. I want the court to recognize that we don't have any—we've agreed to providing boat access, we agree to pay them rent, we will relocate the line if they pay for it. There's a long list of things that are completely enforceable. That's why I thought you answered my question the exact opposite, because if you came to an agreement today that said the tribe will let you run two trains— Oh, I see. —and that were settled, and it was signed off on and approved, if your legal position were correct, that exact settlement agreement would be unenforceable. No, I'm sorry if I misunderstood your hypothetical, Judge Bennett. So the test is a rule of reason. It's does the settlement term unreasonably interfere with interstate commerce? Now, limiting the number of cars that can travel when shippers demand more is the paradigm interference, so this is a pretty easy case on that. And at the opposite end, for example, providing boat access across the line is very unlikely to ever be an interference, and therefore that, I think, in all cases would be enforceable. Judge Bennett, your example, I think, is one that could depend on the facts. For example, if it were impossible to respond to the shipper's reasonable request for service with two trains, it might be unenforceable. But if it were, yes, we would need to figure out a way to batch them up in two trains, so it could be enforceable. That one would depend on the facts. But I don't think the particular restriction here for this particular remedy is one where it depends on the facts because it's the clear interference with the shipper's request for service. Well, thank both sides for their arguments. Before you sit down, Mr. Horwich, I should note that the Court has had serious concerns with the integrity of your brief. There are statements and representations that we view as inaccurate and misleading to an unusual degree. You will be receiving from us in writing a request for response with respect to certain aspects of the brief, and the other side will be noticed, but we'll give you a chance to respond. Thank you, Your Honor. I'm disappointed to hear that, and I hope I can satisfy the Court's concerns. Well, we were disappointed at the brief. Swinomish Indian Tribal Community v. BNSF Railroad Company is submitted for decision, and we're now in adjournment.
judges: Hawkins, W. Fletcher, Bennett